**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **LORRIE THOMPSON** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BANK OF AMERICA, N.A.;** | ) | **No.** |
| **BAC HOME LOAN SERVICING,** | ) | |
| **L.P.; BANK OF AMERICA** | ) | **JURY DEMAND** |
| **CORPORATION;** | ) | |
| | ) | |
| **Defendant** | ) | |

**VERIFIED COMPLAINT**

1. Plaintiff bring this action as described in the paragraphs set forth herein. This complaint challenges the failure of Defendant Bank of America Bank, N.A. acting independently and through its subsidiary Defendant BAC Home Loans Servicing, LP (referred to jointly as "BOA" where not otherwise described in their individual capacities) to honor both the terms of their agreement with the United States Treasury for the intended benefit of homeowners, namely the Plaintiff in the within action, as well as their failure to honor agreements directly with the Plaintiff to modify her mortgage and thereby to prevent an unnecessary foreclosure.

2. Plaintiff's claims are simple – when a financial institution enters into a contract in which it promises to modify a loan and prevent an unnecessary foreclosure, homeowners expect that promise to be kept. This is especially true when the financial institution has entered into, and accepted benefits from a federal program specifically targeted at preventing foreclosure and allowing certain homeowners to maintain ownership of their homes.

3. In October 2008, Bank of America accepted $15 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211.

1

In January 2009, in connection with its acquisition of Merrill Lynch, Bank of America accepted another $10 billion in TARP funds along with a partial guarantee against losses on $118 billion in mortgage-related assets. By accepting this payment, Bank of America agreed that it would participate in one or more programs that TARP authorized the Secretary of the Treasury to establish to minimize foreclosures.

4. Consistent with the TARP mandate, the Treasury Department implemented the Home Affordable Modification Program ("HAMP") – a detailed program designed to stem the foreclosure crisis by providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. Companies that accepted money under TARP are subject to mandatory inclusion in HAMP as are certain classes of loans.

5. Bank of America signed a Servicer Participation Agreement ("SPA") with the U.S. Treasury on April 17, 2009 (attached as Exhibit 1 and incorporated by reference) agreeing in its capacity as loan servicer[1] to comply with HAMP requirements and to perform loan modification and other foreclosure prevention services described in the program guidelines. The guidelines issued by the Treasury Department set forth a detailed process whereby a participating servicer such as Bank of America, acting through its subsidiary BAC Home Loans Servicing, must:

> • identify loans that are subject to modification under the HAMP program, both through its own review and in response to requests for modification from individual homeowners;
>
> • collect financial and other personal information from the homeowners to evaluate whether the homeowner is eligible for a loan modification under HAMP;
>
> • institute a modified loan with a reduced payment amount as per a mandated formula, that is effective for a three-month trial period for borrowers that are

---

[1] "Servicer" is the industry term for a financial institution that acts as agent for the owner of a loan to perform many of the functions that deal directly with the homeowner, including processing of payment, loss mitigation and overseeing foreclosure.

eligible for a modification; and

• provide a permanently modified loan to those homeowners who comply with the requirements during the trial period. Whether the homeowner qualifies for a modification or not, participating servicers are also required to provide written notices to every mortgage borrower that has been evaluated for a loan modification, whether or not the borrower has been found eligible.

6. HAMP and its associated directives also set **prohibitions against certain conduct including instituting or continuing foreclosure proceedings while a borrower is being evaluated for a loan modification**, and restrictions on the way a servicer may report the borrower to credit reporting agencies.

7. Though Bank of America accepted $25 billion in TARP funds and entered into a contract obligating itself to comply with the HAMP directives and to extend loan modifications for the benefit of distressed homeowners, Bank of America has systematically failed to comply with the terms of the HAMP directives and has regularly and repeatedly violated several of its prohibitions.

8. Under HAMP, the federal government incentivizes participating servicers to make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1,000.00 for each HAMP modification. However, this incentive is countered by a number of financial factors that make it more profitable for a mortgage servicer such as BOA to avoid modification and to continue to keep a mortgage in a state of default or distress and to push loans toward foreclosure. This is especially true in cases where the mortgage is owned by a third-party investor and is merely serviced by BOA because BOA does not carry a significant risk of loss in the event of foreclosure. On information and belief, BOA does not own a significant majority of the loans on which it functions as servicer.

9. Economic factors that discourage BOA from meeting its obligations under HAMP

3

by facilitating loan modifications include the following:[2]

> • BOA may be required to repurchase loans from the investor in order to permanently modify the loan. This presents a substantial cost and loss of revenue that can be avoided by keeping the loan in a state of temporary modification or lingering default.

> • The monthly service fee that BOA, as the servicer collects as to each loan it services in a pool of loans, is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan to reduce the principal balance results in a lower monthly fee to the servicer.

> • Fees that BOA charges borrowers that are in default constitute a significant source of revenue to it. Aside from income BOA directly receives, late fees and "process management fees" are often added to the principal loan amount thereby increasing the unpaid balance in a pool of loans and increasing the amount of the servicer's monthly service fee.

> • Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors of the unpaid principal and interest payment of a non-performing loan. The servicer's right to recover expenses from an investor in a loan modification, rather than a foreclosure, is often less clear and less generous.

> • Fixed overhead costs involved in successfully performing loan modifications involve up-front costs to the servicer for additional staffing, physical infrastructure, and expenses such as property valuation, credit reports and financing costs.

10. Rather than allocating adequate resources and working diligently to reduce the number of loans in danger of default by establishing permanent modifications, BOA has serially strung out, delayed, and otherwise hindered the modification processes that it contractually undertook to facilitate when it accepted billions of dollars from the United States. BOA's delay and obstruction tactics have taken various forms with the common result that homeowners with loans serviced by BOA, who are eligible for permanent loan modifications, and who have met the requirements for participation in HAMP, have not received permanent loan modifications to which they are entitled.

---

[2] See Thompson, Diane E., Why Servicers Foreclose When They Should Modify and Other Puzzles of Servicer Behavior, National Consumer Law Center (October 2009).

4

11. Because BOA is not meeting its contractual obligations, Plaintiff is wrongfully being deprived of an opportunity to cure her alleged delinquencies, pay her mortgage loan and save her home. By failing to live up to its obligations under the terms of the agreement it entered into with the Department of the Treasury, BOA has left Plaintiff in a state of limbo – worse off than she was before she sought a modification from BOA. Defendants' actions violate their contractual obligations, thwart the purpose of HAMP, and are unfair and deceptive under state laws.

## JURISDICTION AND VENUE

12. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is diversity of citizenship and the amount in controversy is greater than $75,000.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## PARTIES

15. Plaintiff, Lorri Thompson is a citizen of Tennessee.

16. Defendant Bank of America, N.A. is a mortgage lender with headquarters at 101 Tryon Street, Charlotte, North Carolina 28255.

17. Defendant BAC Home Loans Servicing, LP is a subsidiary of Bank of America, N.A., located at 4500 Park Granada, Calabasas, California 91302.

18. At all times herein mentioned, Defendants, Bank of America, N.A. and BAC Home Loans Servicing, LP, both individually and collectively, are and were agents and/or joint venturers of each other, and in doing the acts alleged herein were acting within the course and scope of such agency.

19. Each Defendant had actual and/or constructive knowledge of the acts of the other Defendant as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of said acts.

5

## FACTUAL BACKGROUND

### A. The Foreclosure Crisis

20. Over the last three years, the United States has been in a foreclosure crisis. In late

2009, a congressional oversight panel noted that one in eight U.S. mortgages was in foreclosure

or default.[3]

21. For the third quarter of 2010, foreclosure filings-default notices, scheduled auctions and bank

repossessions were reported on 930,437 properties in the 3rd quarter. One in every 139 U.S.

housing units received a foreclosure filing in this quarter.[4]

22. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique

property and face homelessness, but also on the surrounding neighborhoods that suffer decreased

property values and municipalities that lose tax revenue.

23. The foreclosure crisis is not over. See Eric Tymoigne, Securitization, Deregulation,

Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30,[5] (citing a

Credit Suisse study showing monthly mortgage rate resets).

### B. Creation of the Home Affordable Modification Program

24. Congress passed the Emergency Economic Stabilization Act of 2008 on

October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on

February 17, 2009 (together, the "Act"). 12 U.S.C. § 5201 et seq. (2009).

---

[3] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfin.
[4] Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfin.
[5] Available at http://papers.ssrn.com/so13/papers.cfm?abstract_id=1458413
Case 1:10-md-02193-RWZ Document 69 Filed 08/08/11 Page 15 of 130

25. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." Id.

26. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. Id.

27. Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

28. In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

29. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." Id.

30. The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C. § 5220.

31. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

32. The Making Home Affordable program consists of two subprograms. The first

7

sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

33. The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now known as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

34. HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

**C. Duties of a Participating Servicer Under HAMP**

35. Because Bank of America accepted $25 billion in federal funds and additional loan guarantes, it was required to participate in HAMP for the loans on which it functions as a loan "servicer." On April 17, 2009, Steve R. Bailey, of Bank of America, N.A., executed a SPA with the federal government. See Exhibit 1 attached hereto.

36. As a Congressional Oversight Panel evaluating HAMP noted, "[p]articipation in the program by servicers is voluntary, but once a servicer elects to participate, adherence to the program standards is mandatory for all the servicer's loans." Congressional Oversight Panel, December 14, 2010 report at 4 (hereinafter December 14 Report).[6]

37. The SPA executed by Mr. Bailey incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications," referred to as "Supplemental Directives" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers.

---

[6] Available at http://cop.senate.gov/reports/library/report-121410-cop.cfm.

These documents together are known as the "Program Documentation," see SPA § 1.A, and are incorporated by reference herein. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." SPA §§ 1.A., 2.A.[7]

38. The first Supplemental Directive ("SD") was issued on April 6, 2009, and states that the national mortgage modification program was "aimed at helping 3 to 4 million at-risk homeowners – both those who are in default and those who are at imminent risk of default – by reducing monthly payments to sustainable levels." SD 09-01 (Exhibit 2) at 1. This directive and the directives to follow were issued to provide guidance for adoption and implementation of HAMP "to provide a borrower with sustainable monthly payments." Id.

39. The Program Documentation requires Participating Servicers to evaluate all loans that are 60 or more days delinquent or appear to be in imminent default (as defined by the Program Documentation), to determine which loans meet the HAMP eligibility criteria. SD 09-01 (Exhibit 2) at 4. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the borrower is eligible for a HAMP modification. Id. at pp. 3-4.

The Program Documentation has been consolidated by the U.S. Treasury Department into a single document known as the Making Home Affordable Handbook ("Handbook") (current version 4.1 attached hereto as Exhibit 3). This document describes the basic activities required under HAMP and is incorporated by reference in Complaint.

---

[7] The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation-Frequently Asked Questions ("HAMP FAQS," attached hereto as Exhibit 4), Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5).

9

40. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP") agreement. Second, upon successful completion of the TPP, the Servicer must offer the homeowner a permanent modification.[8]

41. A mortgage is eligible for HAMP if threshold criteria enumerated in the Program Documentation are met. Aside from criteria that require the loan to be a first lien mortgage originated before 2009, that the property be occupied, and that it be the borrower's principal residence, the most salient conditions are that the loan is delinquent or default is reasonably foreseeable; that the borrower documents a financial hardship (as defined in the Program Documentation); and that the "borrower has a monthly mortgage payment ratio of greater than 31 percent" of the borrower's monthly income.

42. The Plaintiff made an application that included personal financial information, tax information, and a statement attesting to their hardship.

43. Once the participating servicer has determined a borrower meets HAMP's threshold requirements, based on both information already in its possession and information submitted by the applicant homeowner, the servicer must then determine if the borrower is eligible to receive a HAMP modification, the goal of which is to modify the terms of the loan such that for the first five years, the monthly mortgage payment is equal to 31 percent of the borrower's income.

44. The servicer does this by applying the steps enumerated in the Program Documentation to the loan, in the stated order of succession until the borrower's monthly mortgage payment ratio is reduced to 31 percent of the borrower's monthly income. This process is known as the

---

[8] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

10

"waterfall." These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). See SD 09-01 (Exhibit 2) at 8-10. BOA does not have discretion as to how this formula is applied – HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached.

45. If application of the steps in the Program Documentation yields terms that produce the target 31% monthly mortgage payment, the servicer must offer the borrower a TPP Agreement if the modification provides a net present benefit to the mortgage holder. This determination is known as the "Net Present Value" or ("NPV") test and is to be performed prior to the tender of a TPP Agreement.

46. The TPP Agreement describes a three or four month trial period in which the homeowner makes mortgage payments based on the modification formula stated in the Program Documentation. BOA uses a standard form agreement to offer TPP Agreements to eligible homeowners. (Exhibit 4).

47. The very first sentence of the form TPP Agreement used by BOA states: "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Servicer will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

48. Section 3 of the form TPP Agreement repeats this promise: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material

respects, the Servicer will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."

49. Further, the form TPP Agreement defines a finite "trial period" (usually three months but in some cases, four months), states that "TIME IS OF THE ESSENCE" and identifies the "modification effective date" as the first day of the month following the month in which the final trial payment is due.

50. If the homeowner executes the TPP Agreement, complies with all documentation requirements verifying the information on which the initial finding of eligibility was made and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner must be offered a permanent modification.

51. However, Plaintiff never got that far. BOA deliberately obstructed the Plaintiff's efforts to obtain a modification.

**D. BOA has Failed to Meet its HAMP Obligations as Promised under the SPA**

52. By entering into the SPA, Bank of America covenanted that all services will be performed in compliance with all applicable federal, state and local laws, specifically including state laws designed to prevent unfair, discriminatory or predatory lending practices. SPA, Ex. 1 at ¶ 5(b).

53. Under the SPA, Bank of America also covenanted that it would perform the services required under the Program Documentation and the Agreement in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than which Bank of America exercises for itself under similar circumstances, and that Bank

12

of America would use qualified individuals with suitable training, education, experience and skills to perform the Services. Id. at ¶ 5(d).

54. Bank of America has failed to meet its obligations under HAMP regarding Plaintiff's request for loan modification. Plaintiff requested to be evaluated for a modification under HAMP whereby she faced unexplained delays and weeks or months with no communication from BOA after providing the requested information. Plaintiff attempted to contact BOA by telephone whereby she faced long periods of time on hold and are transferred between service representatives in a deliberate effort to cause the Plaintiff to give up and to terminate the call. BOA falsely informed the Plaintiff that it did not receive requested information and demanded that documents be re-sent.[9] The Declarations provided by former BOA employees acknowledge that they were told to deliberately stall, ask for documents over and over despite having the documents and eventually deny loan modifications, even for Borrowers who would otherwise be eligible.

55. Further, Program Documentation includes an entire set of notice requirements that BOA ignored, including the provision of clear explanations when Plaintiff was denied participation in HAMP. HAMP requires a participating servicer to send a Borrower Notice to every homeowner that has been evaluated for HAMP but is not offered a Trial Period Plan, is not offered an official HAMP modification, or is at risk of losing eligibility for HAMP because they have failed to provide required financial documentation. SD 09-08 (Ex. 5) at p. 1. BOA did not send Plaintiff the required explanation. Plaintiff was merely denied a modification without explanation only to be told to start the process over again.

56. In addition, BOA's conduct has run afoul of the following prohibitions in HAMP Rules regarding Plaintiff's attempts to receive a HAMP modification:

_____

[9] See Declarations of filed with U.S. District Court for the District of MA Doc. #210 Exhibits 1-7.

13

• Proceeding with a foreclosure sale. Plaintiff's foreclosure sale is scheduled for August 22, 2013 despite Plaintiff's attempts to receive a modification. (See Exhibit 6, Plaintiff's Affidavit). Any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period, and until the borrower has been considered and found ineligible for other available foreclosure prevention options. See SD 09-01 (Ex. 2) at p. 14.

57. Former BOA employees have confirmed that BOA is not complying with HAMP in a manner that can only be considered deliberate. BOA's general practice and culture is to string homeowners along with no intention of providing actual and permanent modifications. Instead, BOA has put processes in place that are designed to foster delay, mislead homeowners and avoid modifying mortgage loans.

58. One former employee described BOA commonly encouraging or even requiring homeowners to resubmit financial information each time the customer called in to inquire about a pending modification. Any change in financial information – even a small change – then causes BOA to restart the application process under the pretext of changed factual information.

59. BOA customer service representatives are instructed to mislead homeowners who call to inquire about loan modifications for which they have applied. According to former employees, customer service representatives regularly inform homeowners that modification documents were not received on time or not received at all when, in fact, all documents have been received. Similarly, homeowners are regularly told that documents were sent on a particular date when, in fact, BOA had not sent the documents at all. The Plaintiff in these matter was subjected to redundant and ambiguous demands for documents by BOA– documents that had already been submitted, that were not required to determine eligibility under HAMP guidelines, or that were unnecessary "updates" of previous documents.

14

60. BOA has chosen not to comply with the obligations it undertook to participate in HAMP by entering into the SPA. As a Congressional Oversight Panel recently found, the failure of servicers to follow through with HAMP's requirements has resulted in the program failing to help the vast majority of homeowners facing foreclosure. Congressional Oversight Panel, December 14, 2010 report at 4 (hereinafter "COP Report").[10]

61. Despite HAMP's straightforward premise of providing loan modifications to prevent foreclosures, its prohibitions against foreclosing on a homeowner in the midst of applying for a HAMP modification, and its requirement that all other foreclosure alternatives be exhausted as a prerequisite to foreclosure, the number of foreclosure completions has actually risen since the time HAMP went into effect and since Bank of America began participating. Id. at 9.

62. In evaluating HAMP to date, the Congressional Oversight Panel specifically found that its shortcomings were largely due to the role mortgage servicers such as BOA have played in the process and their interest in turning substantial profit from foreclosure related fees. The Panel found that the Treasury department has "failed to hold loan servicers accountable when they have repeatedly lost borrower paperwork or refused to perform loan modifications." Id. at 5. The Panel thus noted a "need for greater accountability in HAMP, particularly with regard to the activities of participating servicers." Id. at 7.

## E. BOA's Actions Caused Injury to Plaintiff

63. Plaintiff has suffered injury caused by BOA's actions, including but not limited to longer loan payoff times, improper negative reporting to credit bureaus resulting in monetary harm due to damaged credit, monetary damages from higher principle balances, inappropriate fees and charges assessed, including broker price opinion fees, inspection fees,

---

[10] Available at http://cop.senate.gov/reports/library/report-121410-cop.cfm.

15

attorney's fees, "process management" fees, late fees and other charges associated with delinquency and default, and increased accrued interest.

64. BOA's behavior has also left the Plaintiff in limbo, wondering if her home can be saved and preventing Plaintiff from pursuing other avenues of resolution.

## <u>COUNT I</u>
### Breach Of Contract / Breach Of Duty Of Good Faith And Fair Dealing Arising Out Of BOA's Performance Of The Servicer Participation Agreement

65. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

66. The SPA and the explicitly incorporated Program Documentation constitute a contract for which Plaintiff is an intended beneficiary and under which BOA has undertaken duties to act for the benefit of Plaintiff.

67. By entering into the SPA and accepting valuable consideration including $25 billion in funds from the U.S. Treasury, BOA covenanted, on behalf of itself and its subsidiaries, to administer its contractual obligations with principles of good faith and fair dealing.

68. BOA has breached its contractual duties by failing to provide Plaintiff with the opportunity to accept a permanent loan modification that complies with the terms as calculated in accordance with the methods specified in the Supplemental Directives incorporated into the SPA.

69. BOA breached its duties under the SPA by deliberately acting to delay and otherwise frustrate Plaintiff's loan modification processes; demanding information already in its files; making inaccurate calculations and determination of Plaintiff's eligibility for HAMP; and failing to follow through on written and implied promises.

70. Plaintiff suffered harm and are threatened with additional harm by way of the foreclosure scheduled for August 22, 2013 from BOA's breach. Had BOA complied with the terms of the SPA, Plaintiff would have been given the opportunity to obtain a modified mortgage loan on

16

terms specifically designed to be affordable based on her financial circumstances. Plaintiff has suffered additional harm in the form of foreclosure activity against her home that could have been avoided.

## COUNT II
### Violation of the Equal Credit Opportunity Act

71. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

72. The "Making Home Affordable Program Request For Modification and Affidavit" completed by the Plaintiff was a completed application for credit. The Plaintiff was asking BOA to obtain more favorable credit terms.

73. At all times relevant hereto, it was BOA's practice or policy not to send timely notice letters to consumers when it denied their applications.

74. BOA also failed to provide Plaintiff with the statutory disclosures required by the ECOA.

75. The above-alleged actions and omissions of BOA violated the ECOA, 15 U.S.C. § 1691 et seq. and Regulation B, 12 C.F.R. § 202.9. The Plaintiff is entitled to attorney's fees and costs pursuant to 15 U.S.C. § 1691e(d).

76. Further, the above-alleged actions and omissions of BOA entitles the Plaintiff to actual and punitive damages pursuant to 15 U.S.C. § 1691e(a) and (b).

77. The Plaintiff is entitled to declaratory and injunctive relief requiring BOA's compliance with the ECOA pursuant to 15 U.S.C. § 1691e.

## COUNT III
### Negligent Hiring and Supervision

78.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-77 above as if set forth herein in full.

79.     Rather than hire employees with suitable training, education, experience, and skills to determine HAMP eligibility and perform other loan modification services, BOA routinely hired temporary workers and other persons who lacked such training, education, and experience. Furthermore,  BOA routinely replaced employees with experience and training with employees who lacked such skills.

80.     BOA further failed to train new employees, often providing mere days of training as to how to perform relatively complex calculations and use unfamiliar computer programs designed to compute and determine the HAMP eligibility.

81.     Based on these failures, BOA knew or should have known that its loan modification employees had a particular unfitness for the position so as to create a danger of harm to third persons such as Plaintiff  insofar as such employees provided false information to Plaintiff, and improperly perform calculations under the HAMP directives to determine eligibility.

82.     Such particular unfitness was known or should have been known to BOA  at the time of the employees' hiring or retention. On information and belief, BOA preferred to utilize employees that lacked the requisite education, experience, and training so that borrowers would become too frustrated to pursue their modifications and to correct BOA's numerous errors. The result was that BOA was able to add additional monies on to what Plaintiff allegedly owes prior to instituting foreclosure proceedings.

83.     BOA's hiring and employment of particularly ill-suited employees directly and proximately caused Plaintiff to suffer damages in the form of being wrongfully denied an offer for trial and permanent modification for which she was actually eligible.

84.     As described above, BOA knew or should have known that its employees had a particular unfitness for acting as loan modification servicers so as to create a danger of harm to third persons such as Plaintiff.

85.     BOA failed to safeguard Plaintiff against this particular unfitness—to the contrary, it fostered and encouraged it. On information and belief, BOA instituted a "one call resolution" policy designed to ensure that borrowers only spoke to a particular customer service representative on one occasion, and never to the same representative twice. This would ensure that borrowers would have to constantly "start over" each time the customer called BOA to check on the status of their modification because the representative had no familiarity with the progress or status of the borrower's application.  As stated in Plaintiff's affidavit, she was assigned a single point of contact, Janna Parker, then re-assigned another single point of contact, Jason Mullens, then back to Janna Parker.

86.     Likewise, when BOA reviewed employees for bonuses, raises, and other employee compensation, BOA would consider "drop time," or the average length of time it took a customer service representative to get a complaining or inquiring borrower off of the telephone. The shorter the "drop time," the more compensation the employee would receive or become eligible for.  See Declarations of filed with U.S. District Court for the District of MA Doc. #210 Exhibits 1-7.

87.     As a result of these incentives and policies, BOA ensured that aggrieved borrowers would become too frustrated to pursue their modifications, complain, or otherwise protest BOA's decisions—no matter how erroneous.

88.     BOA's failure to safeguard its HAMP-eligible borrowers from these practices actually and proximately caused Plaintiff to suffer damages by being wrongfully denied an offer for a

trial and permanent modification and by being stripped of her ability to contest BOA's improper

determinations and miscalculations without the assistance of counsel.

**COUNT IV**
**Fraudulent Misrepresentation/Concealment**

89.     Plaintiff repeats and re-alleges the allegations of paragraphs 1-88 above as if set

forth herein in full.

**Concealment** – Failure to Disclose Potential for Reconsideration

90.     At the time Plaintiff entered applied for a modification, Defendant intentionally failed to

disclose that it would fail to adhere to applicable HAMP guidelines and directives and

would, in contravention of those directives, evaluate the Plaintiff's eligibility using different

standards and calculations than those required under the directives or worse yet use no standards

and calculations but merely deny Plaintiff as part of a "blitz" performed by the representatives of

BOA in order to receive incentives and bonuses.

91.     Defendant concealed this fact with the intention of inducing Plaintiff to continually apply

for modification after modification increasing the fees and charges and accrued interest in order

to foreclose upon Plaintiff when Plaintiff was left with no other alternative.

92.     Plaintiff would not have applied for a modification had Defendant disclosed its true

intentions to evaluate her using improper standards and calculations.

93.     Plaintiff reasonably relied on the Defendant's silence to her detriment by applying over

and over again for modifications with assurances that she would be eligible and able to obtain a

permanent modification.

94.     Plaintiff's reliance on this concealment has actually and proximately caused her to suffer

damages including without limitation: (a) Plaintiff never received a temporary or permanent

modification agreement for her signature, (b) her credit score was negatively impacted, (c) her credit cards were either cancelled or the available credit was reduced.

## COUNT V
### Negligent    Misrepresentation/Concealment In the Alternative to Count IV

95.    Plaintiff repeats and re-alleges the allegations of paragraphs 1-94 above as if set forth herein in full.

96.    In the alternative, Defendant's misrepresentations and concealments described in Count IV were made or concealed carelessly or negligently, without a reasonable basis for believing them to be true.

97.    Given the circumstances of the loan modification process, Defendant had a duty to communicate accurate information to Plaintiff, which it failed to do.

98.    As described above, these false statements and concealments of material fact actually and proximately caused Plaintiff to suffer damages in that she never received a temporary or permanent modification agreement for her signature or any other offer for permanent modification.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests the following relief:

a.  Enter a judgment declaring the acts and practices of BOA complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing;

b.  Grant an injunction enjoining BOA's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff by way of foreclosure while Plaintiff is applying for a modification;

c. Order specific performance of BOA's contractual obligations together with other relief required by contract and law;

d. Award actual and punitive damages'

21

e. Award Plaintiffs the costs of this action, including the fees and costs of experts,

together with reasonable attorneys' fees;

f. Grant Plaintiff such other and further relief as this Court finds necessary and proper.

Respectfully submitted,

/s/Carol A. Molloy_____
Carol A. Molloy, BPR#024915
6724 Buford Station Road
Lynnville, TN 38472
(931) 527-3603 Phone
(931) 527-0382 Fax